617 S.E.2d 750

Alan D. ANDERSON, Robert and Diane Ressler, William Todt, Thomas A. Brooks, Juliana S. Calhoun, Robin and Keith Lee, Donald J. and Michele B. Hatcher, Philip D. and Jean F. Landfried, Appellants/Respondents,

v.

Hank and Linda BUONFORTE, Respondents/Appellants.

No. 3998.

Court of Appeals of South Carolina.

Heard April 4, 2005.
Decided June 13, 2005.
Rehearing Denied Aug. 29, 2005.

484

John S. Keffer, of Sumter, for Appellants–Respondents.

Michael E. Kozlarek, of Columbia, for Respondents–Appellants.

HEARN, C.J.:

Alan D. Anderson, Robert Ressler, Diane Ressler, William Todt, Thomas A. Brooks, Juliana S. Calhoun, Robin Lee, Keith Lee, Donald J. Hatcher, Michele B. Hatcher, Philip D. Lanfried, and Jean F. Landfried (collectively "the Neighbors"), sued Hank and Linda Buonforte (collectively "the Buonfortes"), seeking to enforce the restrictive covenants of the Indian Hills Subdivision in Sumter, South Carolina. The special referee ordered the Buonfortes to remove a two-car garage from their property and modify a recently built extension to their home. Both parties appeal. We affirm in part and reverse in part.

## FACTUAL/PROCEDURAL BACKGROUND

The Buonfortes began construction of a house in the Indian Hills Subdivision in Sumter, South Carolina. Hank Buonforte convinced his parents to move into his home, promising to build an extension to the main house ("the mother-in-law wing"). Thereafter, he approached the City Planning Director's Office for a variance to his permit and applied to the Sumter City–County Board of Appeals ("the Board") for a variance to the city's setback requirements to build a garage. However, at the Buonfortes' hearing before the Board, several neighbors appeared in opposition to the request.

The Buonfortes applied for a variance with the subdivision's designated representative for enforcement of the restrictive covenants. However, eighteen days later, before the Buonfortes received a response from the representative, the Neighbors sued the Buonfortes, alleging the Buonfortes' mother-in-law wing and garage violated the community's restrictive covenants because: 1) the main structure was no longer a single-family dwelling; and 2) the house no longer complied

with the setback lines. Additionally, the Neighbors sought a temporary restraining order prohibiting any further construction on the lot.

After a full hearing on the merits, the special referee ruled the home was a single-family dwelling within the meaning of the term in the restrictive covenants. Furthermore, the special referee determined the house violated "the general scheme of development" and ordered the garage removed and the "mother-in-law wing" altered to better conform to surrounding houses. The special referee also ordered the Buonfortes to pay all court costs and special referee fees. Both parties appeal.

## STANDARD OF REVIEW

 An action to enforce a restrictive covenant is in equity. *South Carolina Dep't of Natural Res. v. Town of McClellanville*, 345 S.C. 617, 622, 550 S.E.2d 299, 302 (2001). As such, this court may view the facts in accordance with our preponderance of the evidence. However, we should not disregard the findings of the special referee, who was in a better position to weigh the credibility of witnesses. *Tiger, Inc. v. Fisher Agro, Inc.*, 301 S.C. 229, 237, 391 S.E.2d 538, 543 (1989).

## LAW / ANALYSIS

### I. The Neighbors' Appeal

#### A. "Single–Family Dwelling"

Initially, the Neighbors argue the special referee erred by failing to rule on whether the Buonfortes' house was a single-family dwelling or a duplex. We disagree.

 An appellate court must view the trial court's statements as a whole to determine its reasoning. *State v. Evans*, 354 S.C. 579, 584, 582 S.E.2d 407, 410 (2003). Furthermore, "[a]n order should be construed within the context of the proceeding in which it is rendered." *Dibble v. Sumter Ice & Fuel Co.*, 283 S.C. 278, 282, 322 S.E.2d 674, 677 (Ct.App.1984); *see also Eddins v. Eddins*, 304 S.C. 133, 135, 403 S.E.2d 164, 166 (Ct.App.1991) (holding judgments are to be construed as

other instruments, and the determinative factor is the intention of the court, considering the judgment in its entirety).

The special referee's order specifically found the Buonfortes' house, "constitutes a single family unit as defined by the restrictive covenants." Thus, the Neighbors' claim is without merit.

■ Next, the Neighbors assert the contrary argument that the special referee erred by ruling on whether the Buonfortes' structure constituted a single-family dwelling or a duplex. They contend this issue was neither raised by the pleadings nor argued at trial. We disagree.

■ "A judgment must conform to the pleadings and be in accordance with the theory of action upon which the case was tried." *Chandler v. Merrell*, 291 S.C. 227, 228, 353 S.E.2d 135, 136 (1987). However, "[w]hen issues not raised by the pleadings are tried by express or implied consent of the parties, they shall be treated in all respects as if they had been raised in the pleadings." Rule 15(b), SCRCP.

In pertinent part, the Neighbors' complaint alleges, "the ... [Buonfortes'] construction ... violate[s] the restrictive covenants in the following particulars: ... The ... [Buonfortes] are developing and/or constructing a residence and attached apartment/duplex which is in clear violation of the limit to a single family residence...." Furthermore, during the trial, both the Neighbors and the Buonfortes presented extensive testimony about whether the structure was a single-family dwelling or a duplex. Neither party objected to the admission of the testimony. Thus, this issue was both raised in the pleadings and tried by consent during the trial. Consequently, this issue is without merit.

Next, the Neighbors argue the special referee erred by considering the testimony of two of the Buonfortes' witnesses. Specifically, the Neighbors claim the testimony was irrelevant. We disagree.

■ "Any evidence that assists in getting at the truth of the issue is relevant and admissible, unless because of some legal rule it is incompetent." *Toole v. Salter*, 249 S.C. 354, 361, 154 S.E.2d 434, 437 (1967). Furthermore,

[i]n determining a dispute concerning the relevancy of . . . evidence, the question to be resolved is as to whether there is a logical or rational connection between the fact which is sought to be presented and a matter of fact which has been made an issue in the case. Relevancy is that quality of evidence which renders it properly applicable in determining the truth and falsity of matters in issue between the parties to a suit. All that is required to render evidence admissible is that the fact shown thereby legally tends to prove, or make more or less probable, some matter in issue, and bear directly or indirectly thereon.

*Id.* (internal citations omitted).

■ When a term is not defined within a contract, evidence of its usual and customary meaning is competent to aid in determining its meaning. *S.C. Farm Bureau Mut. Ins. Co. v. Oates,* 356 S.C. 378, 382–83, 588 S.E.2d 643, 645 (Ct.App. 2003).

■ The restrictive covenant states only single-family dwellings are permitted on the Buonfortes' property. Furthermore, the covenant expressly prohibits the construction of duplexes. However, neither "single-family dwelling" nor "duplex" is defined within the restrictive covenants.

■ Thus, attempting to demonstrate the house was a single-family dwelling, the Buonfortes presented the testimony of William Henry Hoge, the Planning Director for the Sumter Planning Commission, and John Humphries, the Building Official for the City of Sumter, who testified that pursuant to the applicable Sumter zoning ordinances, the Buonfortes' house was a single-family dwelling. The Neighbors objected, arguing only the testimony of Robert Ross Dinkins, the person responsible for enforcing the restrictive covenants, was relevant on the issue.

We conclude the admitted testimony was relevant to determine the meaning of the term "single-family dwelling" within the restrictive covenants, as the zoning ordinances were evidence of its usual and customary meaning. Thus, the special referee did not err by admitting the testimony.

Lastly, the Neighbors argue the special referee abused his discretion by ruling the Buonfortes' structure was a single-family dwelling. We disagree.

Dinkins testified he was responsible for enforcing the restrictive covenants, and, in his opinion, the structure was a duplex. The Neighbors also admitted the testimony of Charles R. McCreight, an architect, who opined the structure was a duplex.

In response, the Buonfortes presented the testimony of Hoge and Humphries. Hoge testified it was his duty to enforce the zoning ordinances of the City of Sumter. Additionally, he testified the Indians Hills Subdivision is within the City of Sumter, zoned in an area where duplexes are prohibited. In his opinion, the structure constituted a single-family residence under the applicable Sumter zoning ordinances. Humphries, who is responsible for enforcing the City of Sumter building regulations, testified the structure was a single-family dwelling and did not meet the definition of a duplex within the building code definition.

Viewing the entirety of the record, we agree with the special referee that the weight of the evidence indicates the Buonfortes' structure was a single-family dwelling for purposes of the restrictive covenants.

## B. Notice of Restrictive Covenants

 The Neighbors argue the special referee erred by finding the Buonfortes were not on notice of the restrictive covenants. The Neighbors misunderstand the special referee's ruling.

An appellate court must view the trial court's statements as a whole to determine its reasoning. *Evans,* 354 S.C. at 584, 582 S.E.2d at 410. Furthermore, "[a]n order should be construed within the context of the proceeding in which it is rendered." *Dibble,* 283 S.C. at 282, 322 S.E.2d at 677; *see also Eddins,* 304 S.C. at 135, 403 S.E.2d at 166 (holding judgments are to be construed as other instruments, and the determinative factor is the intention of the court, considering the judgment in its entirety).

Constructive notice and actual notice are not one and the same. *Strother v. Lexington County Recreation Comm'n*, 332 S.C. 54, 64, 504 S.E.2d 117, 122 (1998). Rather, a person has actual notice "where the person . . . either knows of the existence of the particular facts in question or is conscious of having the means of knowing it, even though such means may not be employed by him." *Id.* at 64 n. 6, 504 S.E.2d at 122 n. 6. In contrast, "constructive notice is a legal inference which substitutes for actual notice. It is notice imputed to a person whose knowledge of facts is sufficient to put him on inquiry; if these facts were pursued with due diligence, they would lead to other undisclosed facts." *Id.* "A homeowner is charged with constructive notice of any restriction properly recorded within the chain of title." *Harbison Comm. Ass'n, Inc., v. Mueller*, 319 S.C. 99, 103, 459 S.E.2d 860, 863 (Ct.App.1995).

The Buonfortes bought a piece of property in the Indian Hills Subdivision with restrictive covenants in the chain of title. The Buonfortes denied actual notice of the restrictive covenants. The Neighbors did not present any evidence within the record indicating the Buonfortes were on actual notice of the restrictive covenants.

In the findings of fact, the special referee's final order states that the Buonfortes' deed did not put the Buonfortes on "adequate" notice of the restrictive covenants. Subsequently, as a conclusion of law, the special referee held the Buonfortes were unaware of the restrictive covenants when they began building the garage and mother-in-law wing.

We conclude a reasonable reading of the special referee's order, in light of the proceedings in which it was rendered, indicates the special referee found the Buonfortes were not on actual notice, as opposed to constructive notice, of the restrictive covenants. Furthermore, this finding is supported by the weight of the evidence within the record. Thus, we hold the special referee did not err.

## C. Balancing of the Equities

The Neighbors argue the special referee erred by balancing the equities in an arbitrary and unfair manner. Specifically, the Neighbors contend the Buonfortes came to

the hearing with "unclean hands," and thus, both the mother-in-law wing and the garage should be removed. We disagree.

When this court is sitting in equity, and thus viewing evidence for its preponderance, we are to consider the equities of both sides, balancing the two to determine what, if any, relief to give. *See Foreman v. Foreman,* 280 S.C. 461, 464–65, 313 S.E.2d 312, 314 (Ct.App.1984). However, if a party has unclean hands, the party is precluded from recovering in equity. A party will have unclean hands where the party behaves "unfairly in a matter that is the subject of the litigation to the prejudice of the defendant." *Ingram v. Kasey's Assocs.,* 340 S.C. 98, 107, 531 S.E.2d 287, 292 (2000).

The Neighbors sued the Buonfortes, seeking to enforce the restrictive covenants of the Indian Hills Subdivision. Specifically, the Neighbors argued the additions to the Buonfortes' house created a duplex; the mother-in-wing and garage violated the setback lines; and the mother-in-law wing and garage did not conform with the aesthetics of the neighborhood.

While the litigation was pending, the parties signed a consent order providing the following:

ORDERED, that the ... [Buonfortes] immediately cease any further construction regarding the "mother-in-law wing" on the property.... The ... [Buonfortes] will be permitted to install the front window units of said wing along with the door, and can also complete the sides and rear of said wing, however, the ... [Buonfortes] may not continue to build or improve the front of the structure. Further, the ... [Buonfortes] may not destruct or improve the wall separating the "mother-in-law" wing from the main structure.... ORDERED, that the ... [Buonfortes] be allowed to complete the main structure of said building ... Further, the ... [Buonfortes] will be allowed to complete the interior of the balance of the structure ... and the exterior of the entire structure ... *ORDERED, that if the ... [Buonfortes] do continue to build or improve said property beyond the parameters of this Order, that the ... [Buonfortes] do so at their own risk[.]*

(Emphasis added.)

Subsequently, the Buonfortes completed construction of the garage and interior of the mother-in-law wing. Following a

final hearing, the special referee ruled the Buonfortes must remove the garage. Furthermore, the special referee ruled the Buonfortes must remove the front door entrance of the mother-in-law wing, such that the house now only has one front entrance. Moreover, the special referee ordered the Buonfortes to remove the gabled entrance roof.

The Neighbors now contend the special referee erred by balancing the equities to allow the mother-in-law wing to remain because the Buonfortes are seeking equity with unclean hands. Specifically, the Neighbors allege the following particulars weigh against the Buonfortes: 1) the Buonfortes misrepresented information on their original building permit because they did not request a permit for the additions to the house, although they knew they planned to construct additions; 2) the Buonfortes had constructive knowledge of the restrictive covenants before they began to build the additions to their house; and 3) the Buonfortes continued to build after they had actual knowledge of the restrictive covenants.

We do not view the evidence in the same light as the Neighbors. Rather, our view of the evidence indicates the Buonfortes applied for a building permit to construct their original residence. Although the Buonfortes may have intended to construct additions to their residence when they applied for the original building permit, they did not intend to do so without acquiring an additional permit. In fact, prior to construction of the additional structures, the Buonfortes applied for permits to build the additional structures, leading to this lawsuit.

The evidence also indicates the Buonfortes were not on actual notice of the restrictive covenants, as no evidence exists within the record indicating they actually knew the restrictive covenants existed. Rather, the evidence indicates that prior to buying the piece of property, the Buonfortes hired an attorney to conduct a title search. The attorney's report does not indicate the existence of restrictive covenants. Thus, although the Buonfortes were on constructive notice of the restrictive covenants, they were not on actual notice, mitigating any allegation of unclean hands.

Pursuant to the above quoted agreement, the Buonfortes continued to build the additions to their home after com-

mencement of this lawsuit. With the exception of the garage, which the special referee ordered the Buonfortes to remove, the continued building was permitted under the agreement.

We conclude the Buonfortes did not have unclean hands such that they are precluded from the aid of equity, as they have not acted unfairly to the prejudice of the Neighbors. Moreover, we conclude the special referee appropriately weighed the equities of the situation. Thus, we hold the special referee did not err.

## II. The Buonfortes' Appeal

### A. General Scheme of Development

■ The Buonfortes argue the special referee erred by ordering them to remove the garage and alter the mother-in-law wing. They contend Dinkins implicitly approved their construction plans pursuant to an automatic approval provision in the restrictive covenants. We agree.

■ "The cardinal rule of contract interpretation is to ascertain and give legal effect to the parties intentions as determined by the contract language." *Schulmeyer v. State Farm Fire Cas. Co.*, 353 S.C. 491, 495, 579 S.E.2d 132, 134 (2003). Thus, "[i]f the contracts language is clear and unambiguous, the language alone determines the contracts force and effect." *Id.* Where a restriction on land is capable of two different constructions, the construction which least restricts the property is favored. *See Hamilton v. CCM, Inc.*, 274 S.C. 152, 157, 263 S.E.2d 378, 380 (1980) ("A restriction on the use of the property must be created in express terms or by plain and unmistakable implication, and all such restrictions are to be strictly construed, with all doubts resolved in favor of the free use of property.").

The restrictive covenants provide, in pertinent part:

No building, fence, or other structure of any kind shall be begun, erected, or placed on any of the lots [in the neighborhood] until the building plans, specifications, design and plat plan showing the location of such building, fence, or structure on the lot in question has first been approved by Robert Ross Dinkins. . . . *In the event Robert Ross Dinkins, or his designated representative, fails to approve or disap-*

*prove within thirty days after plans and specifications have been submitted to him, or in the event no suits to enjoin the construction have been commenced prior to the completion thereof, approval will not be required and the related covenants shall be deemed to have been fully complied with.*

(Emphasis added.) The Buonfortes argue that because they submitted their building plans to Dinkins and those plans were not approved or disapproved within thirty days, they were free to begin building their home despite the lawsuit filed by the Neighbors. The Neighbors argue that Dinkins' approval became immaterial once they filed their action for an injunction before the Buonfortes completed construction.

To interpret the covenant as the Buonfortes urge, we would have to construe the above language as providing two separate and distinct exceptions to the general rule requiring prior approval: (1) when homeowners submit plans to Dinkins and he fails to approve or disapprove of the plans within thirty days; *or* (2) when homeowners do not submit plans to Dinkins, but they finish building before any lawsuit to enjoin construction is filed. Based on that interpretation, the Buonfortes would not be bound by the restrictive covenants because they submitted their plans to Dinkins, and he failed to approve or disapprove of those plans within thirty days.[1] Although this is a logical interpretation, the covenant, as written, does not explicitly state that the second exception only applies when homeowners choose not to submit plans to Dinkins.

The Neighbors, on the other hand, urge us to find that the Buonfortes are bound by the covenants because a lawsuit to enjoin the construction was filed before the Buonfortes' home was completed.[2] To construe the covenant as the Neighbors

---

1. The Neighbors argue that Dinkins disapproved of the Buonfortes' plans in a letter dated April 4, 2001. In that letter, Dinkins explained that the request for variance and the size of the Buonfortes' home was "above and beyond the normal for the area"; however, rather than deny the plans as submitted, Dinkins wrote that he did not have "the ability to pass judgment." We do not interpret this letter as a denial of the Buonfortes' plans.

2. In fact, the Neighbors' lawsuit was filed only eighteen days after the Buonfortes submitted their plans to Dinkins. Although they believe that the swiftness with which they filed suit strengthens their case, they

urge, we would have to interpret the above excerpted language to provide only one exception to the prior-approval rule: when homeowners submit plans to Dinkins, he fails to approve or disapprove of those plans within thirty days, *and* no lawsuit to enjoin the construction is filed prior to the completion of construction. However, the covenant, as written, uses the disjunction "or" rather than the conjunction "and" between the phrases, indicating there are two separate exceptions to the rule requiring prior approval.

Although both the Buonfortes' and the Neighbors' interpretations of the covenant are logical, both interpretations require us to read words into the covenant that simply are not there. Because two logical interpretations of the same language are possible, we adopt the Buonfortes' construction because it is the less restrictive of the two. *See Hamilton,* 274 S.C. at 157, 263 S.E.2d at 380 ("A restriction on the use of the property must be created in express terms or by plain and unmistakable implication, and all such restrictions are to be strictly construed, with all doubts resolved in favor of the free use of property.").

We therefore find the Buonfortes were free to build the garage and mother-in-law wing pursuant to the plans they submitted to Dinkins because Dinkins failed to approve or disapprove of those plans within thirty days. Accordingly, we reverse the portion of the special referee's order requiring the Buonfortes to remove the garage and alter the mother-in-law wing.

## B. Fees and Costs

██ The Buonfortes argue the special referee erred by ordering them to pay all of the fees and costs of the litigation. We agree.

"In every civil action commenced or prosecuted in the courts of record in this State . . . the attorneys for the plaintiff or defendant shall be entitled to recover costs and disbursements of the adverse party." S.C.Code Ann. 15–37–10 (1977); *see* Rule 54(d), SCRCP ("[C]osts shall be allowed as of course to the prevailing party unless the court otherwise directs.").

do not believe filing during Dinkins' thirty-day response period was critical to their lawsuit.

However, "[n]o costs will be allowed to any party unless he succeed, in whole or in part, in his claim or defense, unless otherwise directed by the judge hearing the cause." S.C.Code Ann. § 15–37–20 (1977).

Because we reverse the portion of the special referee's order requiring the Buonfortes to tear down their garage and to alter the façade of the mother-in-law wing, the Neighbors no longer succeeded on any issue they brought before the special referee. Thus, they are not entitled to recover any attorney's fees or costs from the Buonfortes. *See* S.C.Code Ann. § 15–37–20.

### CONCLUSION

For the foregoing reasons, the order of the special referee is **AFFIRMED IN PART and REVERSED IN PART.**

WILLIAMS, J., concurs and KITTREDGE, J., dissents in a separate opinion.

KITTREDGE, J., dissenting:

I respectfully dissent from that portion of the majority opinion which reverses the order of the special referee. I would affirm the order of the special referee in its entirety.

As an initial matter, I would adhere to this court's prior opinion in *Anderson v. Buonforte,* Op. No. 2004–UP–270 (S.C. Ct.App. filed April 19, 2004) and dismiss the petition for rehearing as improvidently granted.

In this equitable action to enforce restrictive covenants, as noted by the majority, we may find the facts in accordance with our view of the preponderance of the evidence. We do, however, recognize that the special referee was in a better position to weigh the credibility of the witnesses.

The Buonfortes began construction with no regard for the restrictive covenants. Hank Buonforte comes to this equitable litigation with unclean hands. Mr. Buonforte engaged in a pattern of deceit throughout the process. To facilitate approval of the construction loan from the bank, Mr. Buonforte signed the name of Terry Osteen, a licensed contractor who had nothing to do with the construction. Mr. Buonforte also

altered the survey prepared by Joseph Edwards to give the false impression that the proposed construction would be completed within the set-back requirements. Mr. Buonforte further submitted a permit for a 3,500–square–foot home, although he planned all along to build a structure in excess of 5,000 square feet.

In March of 2001, the Buonfortes were formally notified of their violation of the restrictive covenants. The Buonfortes were required to submit "plans and specifications" for review, but Mr. Buonforte only submitted a purposefully vague description of the construction plans, described in the record as a "footprint." Robert Ross Dinkins, pursuant to the restrictive covenants, reviewed the incomplete plans and specifications and responded by letter dated April 4, 2001. The critical portion of Mr. Dinkins' response to Mr. Buonforte reads:

> You are aware that submission of plans, specs [sic], and plot plan is a requirement and their approval before construction begins, according to recorded documents, i.e., restrictive covenants.

I construe this language as disapproving of further construction, pending receipt of further and more specific information.[3] Mr. Buonforte ignored the April 4 letter of Mr. Dinkins and continued construction. In light of these circumstances, numerous landowners in the Indian Hills subdivision promptly filed suit seeking to enforce the restrictive covenants.

The special referee considered the evidence and, in my judgment, reached a fair and equitable result in this difficult case. I would affirm the order of the special referee, including the award of fees and costs and the requirement that the Buonfortes remove the garage and alter the mother-in-law wing.

---

**3.** Mr. Dinkins testified similarly at the hearing: "I've never approved [the plans]. I don't intend to approve them. They do not meet the requirements of the restrictive covenants[,] ... esthetically or harmoniously." When asked about Mr. Buonforte's intentions, Mr. Dinkins responded, "I could not know what he plans to do. He's never supplied the plans and specifications."